UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL PATRICK SEABERG,

    Plaintiff,

v.                                                    Case No. 21-cv-1053

CAROLYN DEKOK, *et al.*,

    Defendants.

### ORDER

Plaintiff Daniel Patrick Seaberg, who is currently incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 10.) Seaberg was allowed to proceed on claims against defendants Carolyn DeKok, Yvonne Schlosser, Juli Hafeman, Krya Vandervelde, Lesli Hrouda, and Angie Sanders for failing to treat Seaberg's broken hand. The defendants filed a motion for summary judgment. (ECF No. 219.) The motion is fully briefed and ready for a decision. For the reasons stated below, the court denies the defendants' motion for summary judgment.

### PRELIMINARY MATTERS

At the outset, there is a question between the parties as to which constitutional standard applies in this case—the Eighth Amendment deliberate indifference standard, which applies if the plaintiff has been convicted, or the Fourteenth Amendment objective unreasonableness standard, which applies if the plaintiff is a

pretrial detainee. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 350-51 (7th Cir. 2018) (explaining that an objective reasonableness standard applies to claims brought by pretrial detainees while a deliberate indifference standard applies to claims brought by prisoners). The Fourteenth Amendment standard is easier to meet for plaintiffs.

Seaberg states that he was a pretrial detainee at the Kenosha County Detention Center (KCDC) during the relevant time period. (ECF No. 245, ¶ 1.) The defendants state that Seaberg was convicted of a crime in Lake County, Illinois in 2016 and in McHenry County Illinois in 2020. (ECF No. 250 at 5.) Shortly thereafter, pursuant to the Interstate Agreement on Detainees, he transferred to KCDC to await trial for charges in Kenosha County, Wisconsin. (*Id.*)

The law governing this question is not clear. *See Hill v Cty. of Montgomery*, No. 9:14-CV-00933 (BKS/DJS), 2018 WL 2417839, *2 (N.D. N.Y. May 29, 2018) ("Whether to classify an individual detained for a suspected probation violation as a pretrial detainee or a convicted prisoner is an 'unresolved and difficult question.'") (Collecting cases). The Seventh Circuit has acknowledged this issue but found it unnecessary to decide it in previous cases. *See Estate of Clark v Walker*, 865 F.3d 544 (7th Cir. 2017) (noting that "[c]ourts have expressed some uncertainty regarding which amendment controls for hybrid forms of detention.")

For the reasons stated below, the court determines that the Eighth Amendment standard applies in this case. The Eighth Amendment's limitations on punishment come into effect once a person has been convicted of a crime. *See Ingraham v Wright,* 430 U.S. 651, 671 n.40 (1977) ("[T]he state does not acquire the

2

power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") Here, Seaberg has been convicted in other jurisdictions. He has had the benefit of the due process protections that are constitutionally required prior to conviction. He is currently serving sentences for those convictions. He just so happens to also be facing trial on new charges at the same time. The fact that he has picked up new charges does not change the fact that he is currently serving a criminal sentence. Thus, because he is still a convicted prisoner, the Eighth Amendment standard applies.

## FACTS

On September 12, 2020, Seaberg engaged in an altercation with another prisoner at KCDC and injured his hand. (ECF No. 245, ¶ 2.) Seaberg states that after the altercation it was "clearly obvious" that he had broken his right index finger "because his finger was hanging and it would flop up and down when he walked." (*Id.*, ¶ 3.) He also states he was unable to make a fist with his right hand. (*Id.*)

Defendant Nurse Schlosser examined Seaberg on September 12, 2020, after the altercation. (ECF No. 245, ¶ 4.) Seaberg told her he was in intense pain and that he believed his finger was broken. (*Id.*) Seaberg asserts that Schlosser observed the swelling in his finger, "the way his finger was hanging", and the cut on his knuckle. (*Id.*, ¶ 5.) Seaberg stated that he believed he needed stitches, to which Schlosser responded that she did not think his cut needed stitches. (*Id.*, ¶ 7.) Schlosser cleaned the cut, applied ointment, and bandaged it with a Band-Aid. (*Id.*, ¶ 6.) Schlosser asked Seaberg "to squeeze a paper towel while holding his hand out in front of him.

3

He could only touch it with his thumb, pinky, and ring finger." (*Id.*, ¶ 10.) Schlosser asked Seaberg if he could make a fist, and he could not. (*Id.*, ¶ 11.) According to Seaberg, Schlosser told him that she thought his hand "was fine". (*Id.*, ¶ 12.) Seaberg repeatedly insisted it was broken. (*Id.*)

It is undisputed that Schlosser then placed a call to non-defendant Dr. Kevin Krembs. (ECF No. 251, ¶ 15.) While Seaberg was unable to hear Dr. Krembs's part of the conversation, he states that Schlosser told Dr. Krembs that "Seaberg was not allowed to have a splint, bandage, or hand wrap because he is was in segregation." (ECF No. 245, ¶¶ 14-15.) The defendants dispute this, and Schlosser states she never told Dr. Krembs that Seaberg could not have a split or wrap. (ECF No. 251, ¶ 15.) Schlosser also told Dr. Krembs that Seaberg could grasp a paper towel, even though according to Seaberg, that was not entirely true. (ECF No. 245, ¶ 18.)

Dr. Krembs determined that "the wrist is non-weightbearing and not an emergency". (ECF No. 221, ¶ 5.) He ordered Seaberg 1000 mg of Tylenol to take twice daily for seven days, ice, and for an x-ray to be "taken on a scheduled x-ray day." (*Id.*) After the phone conversation ended, Schlosser told Seaberg that "we don't believe your hand is broken", and when Seaberg insisted it was, she told him he was going to have an x-ray. (ECF No. 245, ¶ 19.) When Seaberg asked when the x-ray would occur, Schlosser responded that she didn't know. (*Id.*, ¶ 20.) Seaberg also states that he asked for a wrap, or soft stabilizing splint, but Schlosser "ignored him." (*Id.*, ¶ 21.) Seaberg notes that after the appointment, Schlosser did not request any medical restrictions on his behalf, and as a result, when he showered, he was required to be

4

in restraints, which caused him severe pain. (*Id.*, ¶ 25.) The defendants state that "Seaberg was not compelled to take showers while wearing restraints" and could have elected not to shower while in the restricted housing unit. (ECF No. 251, ¶ 25.)

Seaberg states that he only received ice once during the entire time he was in the restricted housing unit, on the evening of September 12, 2020. (ECF No. 245, ¶ 30.) He states that he asked defendant Schlosser for ice and ibuprofen on several occasions while she was on medical rounds, but she refused. (*Id.*, ¶¶ 31-33, 44.) Seaberg also notes that he asked defendants Nurse Vandervelde, Nurse Sanders, Nurse Hrouda, and Nurse DeKok for ice and ibuprofen while they were on medical rounds, but he never received it. (*Id.*, ¶¶ 46, 52, 57, 63-64.) The defendants note that "[n]urses do not provide ice to inmates. Ice is provided to inmates by Detention Center staff personnel." (ECF No. 251, ¶ 30.)

Seaberg also states that Nurses Schlosser, Vandervelde, Sanders, Hrouda, and DeKok, while they were on medical rounds from September 12-17, 2020, ignored his complaints about severe pain, and when he asked to speak to a doctor or supervising health care provider, he was either ignored or told to fill out a sick call slip. (ECF No. 245, ¶¶ 34-68.) Seaberg notes that he was unable to write, so he could not fill out a sick call slip, and because he was in the restricted housing unit, he could not use a Kiosk to fill out a sick call slip. (*Id.*, ¶¶ 36-37.)

On September 17, 2020, Nurse DeKok examined Seaberg, and Seaberg asserts she observed "bruising, swelling, the way his finger was hanging, and his inability to move the fingers of his right hand." (ECF No. 245, ¶ 69.) When DeKok asked Seaberg

5

to make a fist, he was unable to. (*Id.*) Seaberg requested a wrap or a splint, and DeKok ignored his request. (*Id.*, ¶ 70.) Seaberg's hand was then x-rayed. (*Id.*)

On September 18, 2020, when DeKok was passing out medication in the restricted housing unit, she told Seaberg that the x-ray showed his hand was broken. (ECF No. 245, ¶ 71.) When Seaberg asked how he was going to be treated, DeKok stated that she did not know. (*Id.*) Seaberg notes that once it was confirmed that his hand was broken, none of the defendants requested medical restrictions for him, including showering without restraints. (*Id.*, ¶ 74.) The defendants once again state that Seaberg was not required to shower. (ECF No. 251, ¶ 72.)

On September 17, 2020, defendant Nurse Practitioner Hafeman received the report in which the x-ray indicated that Seaberg's hand was broken. (ECF No. 245, ¶ 77.) She also did not request any medical restrictions for Seaberg. (*Id.*, ¶ 78.) Non-defendant Dr. James Collins reviewed the x-ray report and confirmed that Seaberg's index finger was broken. (*Id.*, ¶ 80.) It is undisputed that Hafeman acknowledged Dr. Collins's findings in writing (*Id.*, ¶ 85) Despite knowing that Seaberg's hand was broken, Hafeman did not provide or arrange for treatment for Seaberg until September 25, 2020. (*Id.*, ¶ 88.) The defendants state that Hafeman tried to arrange for an off-site orthopedic appointment on September 18, 2020, but her ability "was limited by when transportation was available from the detention Center to the doctor and security protocols." (ECF No. 251, ¶ 92.) Seaberg states that despite knowing his hand was broken, Hafeman did not arrange for a splint or protective wrap. (ECF No. 245, ¶ 96.) Hafeman also "admits that once a fracture is confirmed, a splint and off-

6

site treatment may be a potentially appropriate care option." (*Id.*, ¶ 98.) She also admits that "a metacarpal fracture may heal incorrectly without medical treatment." (*Id.*, ¶ 106.)

On September 24, 2020, Seaberg enlisted the help of another prisoner and was finally able to submit a health request. (ECF No. 245, ¶ 109.) The next day, September 25, he was taken to Aurora Health Care to see an orthopedic doctor. (*Id.*, ¶ 113.) The orthopedic doctor inquired as to why Seaberg's hand had not been treated, noting he had no range of motion in his right index finger. (*Id.*, ¶¶ 121-122.) The orthopedist decided it was too late to splint or cast Seaberg's hand, and that he needed surgery, because his hand was healing incorrectly. (*Id.*, ¶ 123.) Ultimately, on October 2, 2020, Seaberg had surgery on his finger, where a permanent screw was placed. (*Id.*, ¶ 126.) He was left with permanent damage in his hand and he can no longer fully close his right hand. (*Id.*, ¶ 127.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

7

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Seaberg claims the defendants violated his Eighth Amendment rights by not providing adequate treatment for his obviously broken finger. A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth*

8

*v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea,* 631 F.3d 843 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Neither party disputes that Seaberg suffered an objectively serious medical injury.

A plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id*. The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). These choices include where a prison official fails to act or do anything to address the serious medical need. *See Gayton*, 593 F.3d at 623-624 (reversing summary judgment in favor of a nurse who refused to examine or treat a vomiting inmate). They also include where an official delays necessary treatment, aggravating a condition or needlessly prolonging a plaintiff's pain. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

9

All defendants but Hafeman (a nurse practitioner) are nurses[1], "Nurses, like physicians, may [] be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015). "[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health." *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012). "[A] nurse confronted with an inappropriate or questionable practice should not simply defer to that practice, but rather has a professional obligation to the patient to take appropriate action, whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010).

There are material questions of fact as to whether Schlosser was deliberately indifferent to Seaberg's broken finger. Taking the facts in a light most favorable to Seaberg, it was "clearly obvious" that his finger was broken as it "was hanging and it would flop up and down when he walked." (ECF No. 245, ¶¶ 2-3.) He also could not fully make a fist or fully grasp a paper towel. While it is undisputed that Schlosser called Dr. Krembs, Seaberg asserts that she actively dissuaded him from providing a splint or protective wrap to Seaberg, citing security concerns in segregation. It is also undisputed that Schlosser, at the direction of Dr. Krembs, ordered Seaberg an x-ray, but not immediately. The Seventh Circuit Court of Appeals, in *Conley v. Birch*, 796

---

[1] The defendants argue that Hrouda, Sanders, and Vandervelde were never added as defendants, but the court's May 30, 2023, order clearly swaps these defendants in for the Jane Doe Nurses #1-4 placeholders. Also, Seaberg, in his response materials, connects the defendants to specific actions alleged in the complaint. The court disregards this argument.

10

F.3d 742, (7th Cir. 2015), held that where a doctor knew that a plaintiff had a probable fracture (denoted by severe swelling, discoloration, and loss of function), and his treatment was ibuprofen and an x-ray that would not be taken until several days later, he could be found deliberately indifferent to the plaintiff's medical needs. *Id.* at 747-48. The court determined that this was not simply a case of the doctor-defendant exercising medical judgment in a negligent fashion (which would be insufficient to rise to a level of a constitutional violation). *Id.* at 748. The defendant-doctor refused to promptly order an x-ray and provide protective treatment (such as immobilization of the plaintiff's hands), which a reasonable jury could conclude would be blatantly inappropriate. *Id.*

Schlosser argues that she was simply following Dr. Krembs's recommendations. However, when taking the facts in a light most favorable to Seaberg, a reasonable jury could conclude that Schlosser knew Dr. Krembs's analysis and prescribed treatment over the phone was inadequate like the doctor's prescribed treatment in *Conley*. As stated above, nurses have an obligation to push back in light of obvious risks to a plaintiff's health. The evidence demonstrates that not only did Schlosser not question Dr. Krembs's determinations, but she also actively advocated to not provide Seaberg with a protective wrapping. While defendants can justify medical choices if the medical choice "serves a penological interest," *see Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019), the defendants here do not explain why absolutely no protective solution was possible.

11

A reasonable jury could also conclude that the defendants' failure to provide what little treatment Seaberg was prescribed while in the restricted housing unit—ice and either Tylenol or ibuprofen—was deliberate indifference. All the defendants except Hafeman knew that Seaberg was asking for ice and pain medication while doing their rounds but did not provide them. The defendants state that it was not their job to provide ice, but Seaberg asserts that it was obvious his hand was swelling. While the defendants did not have to go physically retrieve the ice, they do not explain why they did not request security staff to provide ice. They also provide no evidence as to why Seaberg was not given his pain medications.

Further a reasonable jury could conclude that all of the defendants' failure to provide, request, or recommend any medical restrictions was deliberate indifference. The most prominent example Seaberg provides is that they did not provide him an accommodation for showering. Instead, because he was in the restricted housing unit, he had to shower in restraints, which caused him severe pain. The defendants' response to this is that Seaberg did not have to shower. A prison official's failure to prevent an unnecessary and wanton infliction of pain, without providing some sort of legitimate penological interest, rises to the level of deliberate indifference. *Id.* Once again, the defendants fail to explain why it was necessary for Seaberg to shower with restraints on, instead arguing that Seaberg could choose between immense pain and uncleanliness. The court notes that not allowing a prisoner to shower could also rise to the level of an Eighth Amendment violation. *Conner v. Home*, 17-CV-1387, 2017 WL 11485799 at *3 (E.D. Wis. Dec. 6, 2017)

12

The defendant nurses, prior to Seaberg finally being seen by the specialist on September 25, 2020, also could be found deliberately indifferent for ignoring obvious signs of a worsening condition while on medical rounds. As stated above, while the nurses may not have been able to proactively provide medical treatment, they still had an obligation to alert some more senior health staff to the situation. The defendants provided no evidence that they did so here.

Seaberg finally had an x-ray on September 17, 2020, five days after the injury. The next day, DeKok, informed Seaberg his hand was broken. Yet, she did not provide further treatment, such requesting a protective wrap, providing additional medical restrictions, or informing him that he would be seen by an advanced care provider. A reasonable jury could conclude that she was deliberately indifferent.

Similarly, Hafeman, who as a nurse practitioner had more ability to treat Seaberg, learned about Seaberg's broken finger on September 17, 2020, and yet apparently did nothing other than attempt to schedule Seaberg to see an orthopedic specialist. She did not provide a splint or protective wrap, despite admitting that she knew providing Seaberg a splint or other protective wrapping was the appropriate course of action. She also delayed Seaberg's treatment for several days for the vague reason that transportation was unavailable. Because the defendants did not provide more detail about the purported security interest that caused a delay in treatment from a specialist, a reasonable jury could conclude this constituted deliberate indifference.

13

Much of the defendants' argument in their reply brief focuses on the fact that Seaberg failed to secure expert testimony, thus he cannot establish the applicable standard of care and that the standard was not met. The fact is, however, that *pro se* inmate litigants almost never have expert witnesses. The Seventh Circuit has held that deliberate indifference generally does not require expert testimony because it usually is "not so complicated that an expert was required." *Ledford v. Sullivan*, 105 F.3d 354, 359 (7th Cir. 1997). Seaberg's case is not so nuanced that an expert is required, at least at the summary judgment stage. Indeed, "[a]n inmate can survive a motion for summary judgment on a deliberate indifference claim based solely on their own testimony explaining what happened." *Schillinger v. Yang*, Case No. 23-cv-1350-bhl, 2023 WL 7533769 at 3 (Nov. 13, 2023). That might change as this case moves to trial, but failing to provide expert testimony at this stage does not warrant summary judgment.

Because a reasonable jury could conclude that the defendants, in failing to adequately address Seaberg's broken finger, were deliberately indifferent to a serious medical need, the court denies their motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the court denies the defendants' motion for summary judgment. The court will set a scheduling conference at a later date to discuss next steps.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 68) is **DENIED.**

Dated in Milwaukee, Wisconsin this 10th day of June, 2025.

STEPHEN DRIES
United States Magistrate Judge